The COCA–COLA COMPANY,
Coca–Cola Enterprises, Inc.,
Appellants–Defendants,

Hondo Incorporated d/b/a Coca–Cola Bottling Company Indianapolis, and Coca–Cola Bottling Company Indianapolis, Inc., Defendant,

v.

BABYBACK'S INTERNATIONAL, INC., Appellee–Plaintiff.

No. 49A02–0308–CV–703.

Court of Appeals of Indiana.

April 8, 2004.

Gary P. Price, Peter S. French, Matthew S. Tarkington, Lewis & Kappes, P.C., Indianapolis, IN, Attorneys for Appellant, The Coca–Cola Company.

Kent M. Frandsen, Carol Sparks Drake, Parr Richey Obremskey & Morton, Lebanon, IN, Attorneys for Appellant, Coca–Cola Enterprises, Inc.

Marvin Mitchell, Richard J. Dick, Stephen P. Kenley, Mitchell Hurst Jacobs & Dick, LLP, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BARNES, Judge.

### Case Summary

Coca–Cola Enterprises, Inc. ("CCE") and the Coca–Cola Company ("Coke USA") appeal the trial court's denial of their motions for summary judgment in response to Babyback's International, Inc.'s, ("Babyback's") complaint alleging breach of contract, tortious interference with a contractual relationship, and other tort claims. We affirm.

### Issues

CCE raises several issues, which we consolidate and restate as whether the trial court properly denied its partial motion for summary judgment. Coke USA raises one issue, which we restate as whether the trial court properly denied its motion for summary judgment.

### Facts [1]

Babyback's made ready-to-eat barbeque products, which were available in grocery stores. Coke USA owns the formulas to Coca–Cola soft drinks and licenses the rights to manufacture those beverages to various bottling companies, including Coca–Cola Bottling Company Indianapolis, Inc. ("Coke Indy") and CCE. Coke Indy bottles Coca–Cola products for the Indianapolis area. CCE is a large bottling company whose markets include Louisville and Atlanta.

In January 1997, Babyback's and Coke Indy entered into a written contract, which provided that Coke Indy and Babyback's would co-market their products to 300 area grocery stores. Under the contract, Baby-

---

1. A portion of CCE and Coke USA's joint appendix is confidential. As such, we describe factual disputes and the details relating to many of Babyback's claims accordingly.

back's made arrangements to provide free-standing double-door coolers to the grocery stores. Coca–Cola products were shelved on one half of the cooler and Babyback's products were shelved on the other half. In return, Coke Indy was to pay Babyback's $700 per year for five years. After the program began, Coke Indy experienced increased sales of its products.

In the spring of 1997, Babyback's met with CCE about expanding the co-marketing program to Louisville. Babyback's and CCE's Louisville division entered into an oral agreement to co-market their products in the Louisville area. The terms of the agreement were to be the same as Babyback's contract with Coke Indy. Although, this agreement was never reduced to a written contract, Babyback's supplied coolers to area grocery stores and CCE displayed Coca–Cola products in them.

In the fall of 1997, Babyback's and CCE discussed expanding the co-marketing concept to other markets, including Atlanta. Although the parties reached an oral agreement,[2] they never entered into a formal written agreement. Regardless, Babyback's ordered and installed coolers in several Atlanta grocery stores and incurred marketing and placement fees and other expenses. Babyback's also ordered additional coolers, contacted many grocery store chains, and operated at a loss in Atlanta in an attempt to secure the placement of coolers in other areas.

In the meantime, Coke USA began to have concerns about the quality of Babyback's product. It had two inspectors visit Babyback's processing plant even though the USDA was monitoring the plant and no violations had been reported. Coke USA decided not to continue associating with Babyback's and, pursuant to the licensing agreements, refused to allow Coke Indy or CCE to bottle Coca–Cola if they continued to associate with Babyback's. Babyback's relationships with CCE and Coke Indy deteriorated, and soon thereafter Babyback's stopped production because of financial difficulties.

On January 4, 1999, Babyback's filed a complaint, which was amended on March 20, 1999. The complaint listed various claims that included breach of contract by Coke Indy, tortious interference with a contractual relationship by Coke USA regarding the Coke Indy contract, breach of contract by CCE, tortious interference of a contractual relationship by Coke USA regarding the CCE contract, and breach of fiduciary duties, misappropriation, constructive fraud, and bad faith by CCE. Coke Indy filed an answer, a counterclaim, and a cross-claim against Babyback's. CCE and Coke USA filed answers denying Babyback's allegations and asserting several affirmative defenses. On April 1, 2003, Coke Indy filed a partial motion for summary judgment. That same day, CCE and Coke USA also filed a joint motion for partial summary judgment.[3] On July 11, 2003, the trial court denied all of the motions for summary judgment. CCE and Coke USA now proceed on an interlocutory appeal.[4]

### Analysis[5]

"On appeal, the standard of review of a grant or denial of a motion for summary

---

**2.** CCE contends that the Louisville and Atlanta agreements were two separate contracts. Babyback's argues, however, that the Atlanta agreement merged into the oral agreement in Louisville. Construing the facts in the light most favorable to Babyback's, we must agree with Babyback's.

**3.** CCE only moved for partial summary judgment because it concedes that Babyback's is entitled to relief on the basis of quantum meruit.

**4.** Coke Indy is not a party on appeal.

**5.** CCE and Coke USA requested an oral argument. That motion is denied.

judgment is the same as that used in the trial court." *F.B.I. Farms, Inc. v. Moore,* 798 N.E.2d 440, 444 (Ind.2003). The party appealing from a summary judgment order has the burden of persuading us that the trial court's decision was erroneous. *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 908 (Ind.2001). "Relying on specifically designated evidence, the moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law." *Baker v. Heye–America,* 799 N.E.2d 1135, 1139 (Ind.Ct.App.2003) *trans. denied;* Ind. Trial Rule 56(C). All doubts as to the existence of material issues of fact must be resolved against the moving party, and all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Owens Corning,* 754 N.E.2d at 909. "If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper." *Id.*

### I. CCE's Motion for Summary Judgment

### A. Statute of Frauds [6]

CCE argues that the trial court improperly denied its motion for summary judgment because the parties' failure to reduce their agreement to writing violates the statute of frauds, rendering it unenforceable. The statute of frauds prohibits a person from bringing an action involving any agreement that is not to be performed within one year from the making of the agreement unless the "agreement on which the action is based, or a memorandum or note describing the promise, contract, or agreement on which the action is based, is in writing and signed by the party against whom the action is brought or by the party's authorized agent[.]" Ind.Code § 32–21–1–1(b)(5).

Whether a writing satisfies the statute of frauds is a question of law for the court. *See Gibson County Farm Bureau Co-op. Ass'n. v. Greer,* 643 N.E.2d 313, 320 (Ind.1994) (addressing sufficiency of a security agreement under the UCC). "Once the existence of the contract is established, the policy behind the statute is fulfilled, and the only remaining task is to ascertain the precise terms of the contract." *Wehry v. Daniels,* 784 N.E.2d 532, 536 (Ind.Ct.App.2003). If the parties dispute a contractual term, their dispute raises a factual issue for the trier of fact. *Id.* The purpose of the statute of frauds is to preclude fraudulent claims that would likely arise when the word of one person is pitted against the word of another and to remove the temptation of perjury by preventing the rights of litigants from resting wholly on the precarious foundation of memory. *Brown v. Branch,* 758 N.E.2d 48, 51 (Ind.2001).

For a writing to satisfy the statute of frauds, it must set out the agreement with such reasonable certainty that its terms may be understood from the writing itself, without recourse to parol evidence. *National By–Products, Inc. v. Ladd,* 555 N.E.2d 518, 520 (Ind.Ct.App. 1990). A writing that leaves some essential term to be shown by parol evidence, is only a "parol contract" not enforceable under the statute of frauds. *Id.* "All that is required is reasonable certainty in the terms and conditions of the promises made, including by whom and to whom." *Johnson v. Sprague,* 614 N.E.2d 585, 588 (Ind.Ct.App.1993).

---

**6.** We note that Babyback's cites to the statute of frauds defined in the Uniform Commercial Code ("UCC") and to other sections of the UCC. However, because the thrust of the parties' agreement was for the co-marketing to their products and not for the sale of goods, our common law, not the UCC, applies to the agreement. *See Insul–Mark Midwest, Inc. v. Modern Materials, Inc.,* 612 N.E.2d 550, 555–56 (Ind.1993).

CCE argues that a fax from CCE to Babyback's summarizing a meeting between the two on November 18, 1997, is insufficient to satisfy the statute of frauds. Babyback's responds that the fax contained the essential terms of the contract and satisfied the statute of frauds. The fax provided in part:

We enjoyed our meeting today with you and believe we have made further strides toward coming to agreement on a 'quiet partnership' with your company. Your objectives however to have absolute agreement by Friday may be difficult to achieve. Nonetheless, we will move as quickly as possible given the complexities which must be worked through. As we stated several times, we do agree that the complimentary merchandising of Babyback's with the # 1 brand in the world, Coca–Cola, does make sense.

Attached is a recap on the discussion yesterday and also a copy of the directive sent out by Kroger—Atlanta to [its] stores. You will note, as did we, that the communication is a nice recommendation to the store managers, but certainly falls well short of being a mandate. We are also concerned that the memo does not indicate to the stores that they must maintain placement of the cooler for any length of time.

[Attached Memo]

\* \* \* \* \*

- Conversation only pertains to CCE and Babyback's, not [Coke USA]. [Babyback's] should continue [its] dialogue and maintain his contacts with [Coke USA].
- We discussed the need for our CCE divisions to be consulted up front by Babyback's regarding priority accounts which should be targeted in their respective markets. While we are interested in chain supermarkets and other high trafficked accounts, we are not inclined to support placements in small stores.
- CCE needs/prefers signed customer agreements to justify payment and placement. In the absence of such a document from the customer, we would expect an equivalent document from Babyback's. Our legal department will need to advise and recommend on this point.
- Provided above security is in order, CCE will pay Babyback's up front and on an annual basis. These payments will be made against placements which are certain to become a reality within an agreed amount of time, likely 15 days.
- In the event an account terminates the placement of the cooler before the completion of our prepaid term, CCE will expect prorated return of the prepayment from Babyback's.
- In no case will CCE be expected to pay twice for a single placement within a store. Our understanding is that Babyback's will handle all retailer funding against these units.
- The coolers are to be entirely incremental to a store, and never a replacement or substitute for an existing CCE cooler.
- Though we cannot force or commit nationally to media spending against this alliance, our local markets will be encouraged to work with you to promote the concept vial available promotional means. e.g. radio, outdoor, payroll couponing, etc.
- Merchandising of the coolers must allocate 1 full door to Babyback's products, and 1 full door to CCE products. At no time are the 2 product types to be merchandised together in the same door.

- It is our understanding that Babyback's is significantly enhancing production capacity, upwards to 10 times present ability, or 200m + pounds/week.

- We understand that Babyback's will employ a Broker network in each market that will manage product quality and rotation.

- Per our conversation today, you are to send CCE (Skeeter Johntson) a listing of approximately 2000 stores within the territory of the Eastern Group. The list will provide a date by which the units can be placed. It is further assumed that store contacts have been made by Babyback's to gain store level approval of the cooler.

- We agreed in principle that CCE would pay $600 per year per unit to Babyback's for these 2000 placements. Payment will be made up front and on an annual basis in accord with earlier bullet point[s] in this memo.

- Further, it is understood that CCE will not disclose the amount of this funding level to retailers or other bottlers.

- CCE will purchase through 'True Manufacturing' at our costs, existing new inventory which is committed to Babyback's, or those that are presently in place in CCE markets. Sid Hodges will coordinate this on behalf of CCE.

- Finally, after reviewing the above items with our legal counsel and our chief financial officer, it is clear that we will need an audited financial statement from Babyback's in order to proceed with the transaction.

Appellee's App. pp. 67–69. The fax was on Coca Cola letterhead from Dan Marr to Phillipe Rouas, Babyback's president.[7]

■ CCE argues that the fax does not satisfy the statute of frauds because it "evidences no meeting of the minds upon" various subjects, and it suggests that many of terms of the contract are disputed. CCE's Br. p. 18; CCE's Reply Br. pp. 2–3. We note, however, that whether the statute of frauds is satisfied is a different question than whether there was a meeting of the minds so as to create an enforceable contract. *See Wehry,* 784 N.E.2d at 536; *Dupont Feedmill Corp. v. Standard Supply Corp.,* 182 Ind.App. 459, 462, 395 N.E.2d 808, 810 (1979) ("The Statute of Frauds does not govern the formation of contracts, but rather only the enforceability of contracts which have been formed."); *Block v. Sherman,* 109 Ind.App. 330, 339, 34 N.E.2d 951, 955 (1941) ("The writing is the evidence of the agreement, and not the essence of it."); *see also Gibson County Farm Bureau Co-op. Ass'n,* 643 N.E.2d at 320 (observing that whether the statute of frauds has been satisfied is a question of law for the courts and the factual issue of whether there was a meeting of the minds and an underlying intent to create a security agreement is a question of fact.). Thus, to the extent that CCE argues that there was no meeting of the minds or that the terms of the contract are disputed, such analysis is not relevant to our determination of whether the statute of frauds is satisfied. Instead, the parties' intent to enter into a contract and the precise terms of the contract are questions of fact for the jury. *See Wehry,* 784 N.E.2d at 536.

■ CCE contends that the statute of frauds is not satisfied because certain essential terms are missing. These allegedly omitted terms include when performance was to begin; whether Babyback's was to be paid up front and, if so, how much; how long the program would be in effect; the identity and location of the stores in which

---

7. Babyback's argues in depth that the fax satisfied the "signed" requirement of the statute of frauds. CCE briefly responds to this argument and appears to concede that it was in fact "signed." We will not address the issue further.

coolers would be placed; which party would deliver and install the coolers; and how advertising and promotion would be accomplished.[8]

Careful consideration, however, indicates that these questions either are not essential terms of the contract or are addressed by the fax. For example, the fax provides that Babyback's would supply CCE with a list of 2000 stores, indicating when coolers could be placed in those stores. Appellee's App. p. 69. Based on this language, it appears that the parties agreed to place the coolers after Babyback's made arrangements with the stores and provided that information to CCE. The fax twice provides that Babyback's will be paid up front on an annual basis. *See id.* at 68–69. This language governs when Babyback's was to be paid and indicates that the program would be in effect for more than one year. The fax also provides that CCE will pay Babyback's $600 per year per cooler; thus, addressing how much CCE was to pay Babyback's. Contrary to CCE's assertion, the fax also details the type and number of stores in which CCE was interested and required Babyback's to provide CCE with a list of 2000 stores in which the coolers would be placed.

■ CCE also points to parts of Rouas' deposition testimony that differ from the terms contained in the fax in what appears to be an attempt to show that the statute

of frauds is not satisfied because the parties dispute the terms of the agreement. However, we will not consider this testimony because it is parol evidence and because a careful reading of Babyback's breach of contract allegation is based on the terms contained in the fax, not on the terms described by Rouas in his deposition. These discrepancies raise questions as to whether there was a meeting of the minds and as to the precise terms of the contract, not as to whether the statute of frauds is satisfied.

To satisfy the statute of frauds the fax need not specifically address all of the terms that the parties now claim are disputed. It need only demonstrate, with reasonable certainty, the promises made, including by whom and to whom. *See Johnson,* 614 N.E.2d at 588.[9] The fax's specificity and details demonstrate, with reasonable certainty, the essential terms and conditions of the promises made by CCE and Babyback's. When construing the facts and reasonable inferences drawn therefrom in the light most favorable to Babyback's, as we must do, and without looking to parol evidence, we conclude that the fax contains the essential terms of the parties' agreement and satisfies the statute of frauds. CCE has not established that it is entitled to summary judgment as a matter of law on this issue.[10]

---

8. CCE also points out it never determined whether review of Babyback's financial statements was sufficient to proceed with the transaction. However, the satisfaction of this condition does not fall within the scope of the statute of frauds issue because it does not raise a question as to whether an essential term of the agreement was missing from the writing.

9. CCE cites to *Johnson* for the premise that terms may not be omitted or left obscure so as to leave the intention of the parties uncertain regarding substantial terms of the contract.

However, a full reading of the language CCE relies on provides, "Absolute certainty in all terms is not required, but if any essential elements are omitted or left obscure and undefined, so as to leave the intention of the parties uncertain respecting any substantial terms of the contract, the case is not one for specific performance." *Johnson,* 614 N.E.2d at 588 (citation omitted). This language has limited application to our analysis today because Babyback's is not seeking specific performance as its remedy.

10. Because we conclude that the statute of frauds was satisfied, we need not determine

### B. Babyback's Tort Claims against CCE

#### 1. Breach of Fiduciary Duties

CCE argues that there was no special relationship between the parties so as to create fiduciary duties. Generally, equity will act to protect a relationship of trust and confidence between parties and to prevent the party owing the duty from profiting by its breach. *Kreighbaum v. First Nat'l Bank & Trust,* 776 N.E.2d 413, 419 (Ind.Ct.App.2002).

> Although the existence of a confidential relationship depends upon the facts of each case, it can be generally stated that a confidential relationship exists whenever confidence is reposed by one party in another with resulting superiority and influence exercised by the other. Not only must there be confidence by one party in the other, the party reposing the confidence must also be in a position of inequality, dependence, weakness, or lack of knowledge. Furthermore, it must be shown that the dominant party wrongfully abused the confidence by improperly influencing the weaker so as to obtain an unconscionable advantage.

*Id.* (citations and quotations omitted). Whether such relationship exists is a question of fact. *Id.*

CCE contends that no partnership or joint venture was created between the parties and that the parties' arms length negotiations do not rise to the level of a confidential relationship. Babyback's responds that its responsibility to act on CCE's behalf and contact various grocery stores to "sell the program" created an agency relationship between CCE and Ba-

byback's. Appellee's Br. p. 43. Although CCE contends that Babyback's cited no evidence demonstrating that the parties intended to enter into an agency relationship, Babyback's response in opposition to CCE's motion for summary judgment cited to a portion of Rouas' deposition testimony indicating that CCE asked if Babyback's could place coolers in CCE's eastern division grocery stores for CCE. *See* Appellants' App. p. 266.

An agency relationship is confidential and fiduciary, binding the agent to the exercise of utmost good faith. *Union Miniere, S.A. v. Parday Corp.,* 521 N.E.2d 700, 703 (Ind.Ct.App.1988). Whether an agency relationship exists and the scope of the agent's authority is a question of fact for the jury. *Heritage Dev. of Indiana, Inc. v. Opportunity Options, Inc.,* 773 N.E.2d 881, 888 (Ind.Ct. App.2002). The parties dispute whether they intended to enter into an agency relationship.[11] Because this is a question of fact for the jury, the trial court properly denied CCE's motion for summary judgment on this issue.

#### 2. Misappropriation

CCE also asserts that it was entitled to summary judgment on Babyback's misappropriation claim because Babyback's co-marketing idea was not a trade secret that could be misappropriated. There is no indication, however, that the tort of misappropriation protects only trade secrets. Our supreme court has held that the "appropriate remedy for the misappropriation of a corporation name or likeness is found under the state unfair

---

whether the parties' agreement was an agreement to agree at a later time, whether Babyback's part performance removes the agreement from the statute of frauds, whether promissory estoppel requires enforcement of the agreement, or whether the agreement is

an agreement in principle that is outside the scope of the statute of frauds.

**11.** CCE argues in its reply brief that "fiduciary duties flow from the agent to the principal, not vice versa." CCE's Reply Br. p. 20.

competition law and trademark statutes, as well as common law torts unrelated to notions of privacy, such as tortious interference with business relations." *Felsher v. University of Evansville,* 755 N.E.2d 589, 598 (Ind.2001). "Indiana courts have created a cause of action for unfair competition, defined as 'the attempt to create confusion concerning the source of the unfair competitor's goods.'" *Id.* (quoting *Westward Coach Mfg. Co. v. Ford Motor Co.,* 388 F.2d 627, 633 (7th Cir.1968), *cert. denied,* 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968)). Unfair competition is the natural and probable tendency of any conduct, the effect of which is to deceive the public so as to pass off the goods or business of one person as and for that of another. *Id.* Unfair competition is a question of fact. *Id.* "The question to be determined in every case is whether or not, as a matter of fact, the name or mark used by defendant has previously come to indicate and designate plaintiff's goods, or to state it another way, whether defendant, as a matter of fact, is by his conduct passing off his goods as plaintiff's goods, or his business as plaintiff's business." *Id.* (citation and quotations omitted).

■■ CCE argues that Babyback's misappropriation claim fails as a matter of law because the only evidence that CCE had used the cooler to co-market with other food distributors is Rouas' deposition testimony he believed CCE was trying to enter into an arrangement with another meat distributor or a frozen pizza company after the co-marketing scheme with Babyback's fell apart. CCE contends that this "second-hand" report is not competent evidence. CCE's Br. p. 36. CCE, however, provides no analysis or citations to authori-

ty and waives this contention. *See Olcott,* 793 N.E.2d at 1068 n. 1; App. R. 46(A)(8). Because the evidence is disputed as to whether CCE misappropriated Babyback's "trade dress" by stocking the branded coolers with another company's product, this is a question of fact for the jury. The trial court properly denied summary judgment on this issue.

### 3. Constructive Fraud

■■■ CCE contends that it was entitled to summary judgment on Babyback's constructive fraud claim because Babyback's cannot establish that a duty existed by virtue of the parties' relationship. Constructive fraud occurs when a course of conduct secures an unconscionable advantage, irrespective of the actual intent to defraud. *Wells v. Stone City Bank,* 691 N.E.2d 1246, 1250 (Ind.Ct.App.1998), *trans. denied.*

> The elements of constructive fraud are: 1) a duty existing by virtue of the relationship between the parties; 2) representations or omissions made in violation of that duty; 3) reliance thereon by the complaining party; 4) injury to the complaining party as a proximate result thereof; and 5) the gaining of an advantage by the party to be charged at the expense of the complaining party.

*Id.* at 1250–51.

CCE argues that because no fiduciary relationship existed between the parties, the first element of this claim cannot be satisfied. However, if the jury finds that an agency relationship existed between CCE and Babyback's, creating a fiduciary relationship, the first element would be satisfied.

---

CCE, however, fails to support this argument with cogent analysis and citations to authority and waives the issue. *See Olcott Intern. & Co.*

*v. Micro Data Base Systems, Inc.,* 793 N.E.2d 1063, 1068 n. 1 (Ind.Ct.App.2003), *trans. denied;* Ind. Appellate Rule 46(A)(8).

[20] Assuming no agency relationship exits, CCE points out that the parties were only involved in arms length negotiations, and the law is clear that a fiduciary relationship may not be predicated on such an arrangement. *Mullen v. Cogdell,* 643 N.E.2d 390, 401 (Ind.Ct.App.1994), *trans. denied* (1995). However, we have held that a fiduciary relationship is not the only basis for a claim of constructive fraud. *Wells,* 691 N.E.2d at 1251. Our focus is on whether the relationship invokes a duty of good faith and fair dealing. *Id.* In certain relationships, one party may be in the unique possession of knowledge not possessed by the other and may thereby enjoy a position of superiority over the other; such a relationship is one that invokes a duty of good faith and fair dealing. *Mullen,* 643 N.E.2d at 401 (recognizing that the relationship between a buyer and a seller can create a duty).

Generally, whether a legal duty exists is a pure question of law. *Evans v. Buffington Harbor River Boats, LLC,* 799 N.E.2d 1103, 1116 (Ind.Ct.App.2003). However, factual questions may be interwoven, rendering the existence of a duty a mixed question of law and fact to be determined by the jury. *Id.* Determining whether a special relationship existed between CCE and Babyback's so as to create a duty of good faith is a factual question for the jury. *See, e.g., Kreighbaum,* 776 N.E.2d at 419 (observing that the existence of a confidential relationship depends on the facts of the case); *Merchants Nat. Bank v. Simrell's Sports Bar & Grill, Inc.,* 741 N.E.2d 383, 388 (Ind.Ct.App.2000) (recognizing that the assumption of a duty creates a special relationship between the parties and the existence and extent of such duty is ordinarily a question of fact for the fact finder).

[21] In its motion in opposition to CCE's motion for summary judgment, Babyback's pointed to evidence indicating that CCE led Babyback's to believe that CCE would agree to a national contract to prevent Babyback's from taking the co-marketing idea to CCE's competitor. *See* Appellants' App. p. 500. Whether this is sufficient to establish that CCE was in the unique possession of knowledge not possessed by Babyback's allowing CCE to enjoy a position of superiority over Babyback's and invoking a duty of good faith and fair dealing is a question of fact for the jury. Because there is a question of fact as to whether a special relationship existed between CCE and Babyback's, the trial court properly denied summary judgment on this issue.

### 4. Bad Faith

[22] CCE also asserts that the record demonstrates no basis for Babyback's bad faith claim. Bad faith is more than bad judgment or negligence. *Johnston v. State Farm Mut. Auto. Ins. Co.,* 667 N.E.2d 802, 805 (Ind.Ct.App.1996), *trans. denied.* "Bad faith involves the conscious doing of wrong because of dishonest purpose or moral obliquity. It contemplates a state of mind operating with furtive design or ill will." *Id.* CCE claims that there is no evidence to support Babyback's claim that it acted in bad faith. However, CCE did not move for summary judgment on this issue. In its motion, CCE addressed "bad faith" only in relation to Babyback's constructive fraud claim when it argued that no special relationship existed between the parties because it did not act in bad faith.

[23, 24] We recognize that Babyback's did not respond to this issue in its reply brief. An appellee's failure to respond to

an issue raised by an appellant is akin to failure to file a brief. *Vukovich v. Coleman*, 789 N.E.2d 520, 524 n. 4 (Ind.Ct.App. 2003). Accordingly we review CCE's claim for prima facie error. *Id.* However, to the extent that Babyback's raised an independent claim of bad faith in its complaint, CCE's failure to specifically move for summary judgment on this claim and establish that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law, precludes summary judgment on the issue.

### C. Punitive Damages and Attorney Fees

CCE argues that because there is no basis for Babyback's various tort claims, Babyback's should not be awarded punitive damages. However, we have concluded that CCE is not entitled to summary judgment on Babyback's tort claims because genuine issues of material fact exist. Because we have concluded that the trial court's denial of CCE's partial motion for summary judgment on Babyback's various tort claims was proper, it is still possible that punitive damages may be awarded.

 "[T]o recover punitive damages in a lawsuit founded upon a breach of contract, the plaintiff must plead and prove the existence of an independent tort of the kind for which Indiana law recognizes that punitive damages may be awarded." *Miller Brewing Co. v. Best Beers of Bloomington, Inc.*, 608 N.E.2d 975, 984 (Ind.1993).

Punitive damages may be awarded only if there is clear and convincing evidence that the defendant "acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing, in the sum [that the jury believes] will serve to punish the defendant and to deter it and others from like conduct in the future." *Erie Ins. Co. v. Hickman by Smith*, 622 N.E.2d 515, 520 (Ind.1993) (alteration in original) (citation omitted). It is for the jury to decide whether punitive damages should be awarded. *See Stroud v. Lints*, 790 N.E.2d 440, 444 (Ind.2003). Thus, this issue remains for trial.

CCE also sought summary judgment on the grounds that there was no basis for awarding the attorney fees requested by Babyback's. Although there is no contractual basis for awarding attorney fees, Indiana Code Section 34–52–1–1(b) provides that attorney fees may be awarded if the court finds that either party litigated the action in bad faith. Because we have affirmed the denial of CCE's motion for summary judgment, this litigation will likely continue until settlement is reached or trial. Therefore, it is too early to determine whether CCE litigated in bad faith. Moreover, because the trial court has not issued an order awarding either party to pay the other's attorney fees, any decision on this issue would be premature.

### II. Coke USA's Motion for Summary Judgment [12]

 Coke USA argues it was entitled to summary judgment on Babyback's tortious interference with contractual relationship claims. The five elements of tortious interference with a contractual rela-

---

12. In its summary of the argument, Babyback's contends that the only issue the trial court certified for appeal is what the appropriate legal standard is, not whether the facts, as applied to the appropriate legal standard, support Coke USA's claim of justification. However, Babyback's fails to address this issue further in the argument section of its brief and waives this argument for failing to support it with cogent reasoning and citations to authority. *See Olcott*, 793 N.E.2d at 1068 n. 1; App. R. 46(A)(8).

tionship are: (1) the existence of a valid and enforceable contract; (2) defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of contract; (4) the absence of justification; and (5) damages resulting from defendant's breach. *Winkler v. V.G. Reed Sons, Inc.,* 638 N.E.2d 1228, 1235 (Ind. 1994).

The only issue the parties dispute on appeal relates to the absence of justification. Coke USA contends that to satisfy the element of the lack of justification Babyback's must establish that Coke USA's actions were malicious and exclusively directed to the injury or damage of Babyback's. *See Morgan Asset Holding Corp., v. CoBank, ACB,* 736 N.E.2d 1268, 1272 (Ind.Ct.App.2000) (citing *Winkler v. V.G. Reed & Sons,* 619 N.E.2d 597, 600–01 (Ind.Ct.App.1993)). Babyback's contends that in determining whether Coke USA's actions were justified, the overriding question is whether the conduct was fair and reasonable under the circumstances. *Levee v. Beeching,* 729 N.E.2d 215, 221 (Ind.Ct.App.2000).

It appears, however, that the extent of the dispute over the applicable standard is exaggerated. The principal case on this issue is *Winkler,* in which Winkler signed a fifteen-year employment contract to be the general manager of a printing business, Typoservice. *Winkler,* 619 N.E.2d at 598. Approximately two years later Typoservice entered into an agreement to sell its assets to V.G. Reed & Sons, Inc. *Id.* at 599. Reed and Typoservice later amended their purchase agreement to substitute Midwest as the buyer of Typoservice's assets. *Id.* The final purchase agreement excluded Midwest's acceptance of Winkler's employment contract. *Id.* Shortly after it acquired Typoservice's assets, Midwest discharged Winkler. *Id.*

Winkler filed suit alleging, among other claims, tortious interference with an employment contract. *Id.* The trial court entered summary judgment in favor of all defendants on this count. *Id.* On appeal, citing two federal court cases, a panel of this court recognized that to satisfy the absence of justification element, the breach must be malicious and exclusively directed to the injury of another. *Id.* at 600. (citing *Flintridge Station Associates v. American Fletcher Mortgage Co.,* 761 F.2d 434, 441 (7th Cir.1985); *Economation, Inc. v. Automated Conveyor Systems, Inc.,* 694 F.Supp. 553, 562 (S.D.Ind.1988)). We concluded that because Winkler did not argue that Typoservice sold its assets to Midwest solely for the purpose of breaching the employment contract with Winkler, he failed to sustain his burden of establishing the absence of justification and summary judgment was properly granted. *Id.* at 601.

On transfer, our supreme court addressed the tortious interference with a contractual relationship claim. *Winkler,* 638 N.E.2d at 1234. The court concluded that summary judgment was proper because Winkler did not establish the absence of justification. *Id.* at 1235. The court went on to discuss this element of the claim in great detail. *Id.* In determining whether the defendants' conduct was justified, the court considered the following factors:

(a) the nature of the defendant's conduct;

(b) the defendant's motive;

(c) the interests of the plaintiff with which the defendant's conduct interferes;

(d) the interests sought to be advanced by the defendant;

(e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff;

(f) the proximity or remoteness of the defendant's conduct to the interference; and

(g) the relations between the parties.

*Id.* (quoting Restatement (Second) of Torts § 767 (1977)). The court concluded, "As the comments to § 767 indicate, the weight to be given to each consideration may differ from case to case depending upon the factual circumstances, but the overriding question is whether the defendants' conduct has been *fair and reasonable under the circumstances.*" *Id.* (emphasis added).

The court observed that Winkler did not contend that the defendants' conduct was *malum in se* or that their motive was a willful or spiteful intent to injure him. *Id.* at 1235–56. The court further observed that it was undisputed that Typoservice sold its assets because it was in serious financial trouble and that Midwest purchased the assets because its parent company, Reed & Sons, believed it could return the enterprise to profitability. *Id.* The court concluded, "In instances where there is a good-faith purchase of a business, the justification necessary to avoid tort liability for altering existing employment contract will usually be present." *Id.*

Nowhere in its opinion did our supreme court discuss or even suggest that a malicious standard, argued to be the applicable standard by Coke USA, was the appropriate standard with which to analyze the absence of justification. The supreme court's analysis clearly dictates that the overriding question in determining whether there is an absence of justification is whether the defendant's conduct was fair and reasonable under the circumstances. *Id.* at 1235. This determination is reached by considering the seven Restatement factors. The mere fact that our supreme court considered that Winkler did not allege that the defendants' actions were *malum in se* or a spiteful attempt to injure is

insufficient reasoning for us to adopt the malicious standard as Coke USA argues.

Further, although we may be guided by decisions federal courts or other panels of this court, we are not required to follow them. *See Stonger v. Sorrell,* 776 N.E.2d 353, 355–56 (Ind.2002) ("Although we are not bound by federal authority, we look to it for guidance in this case in order to clarify the inconsistencies that currently exist under Indiana law."); *Bowen v. Monroe Guar. Ins. Co.,* 758 N.E.2d 976, 979 (Ind.Ct.App.2001) (declining to follow a decision of a different panel of this court). Instead, we are only bound by the opinions of our supreme court. *See Miller v. Miller,* 763 N.E.2d 1009, 1013 (Ind.Ct.App. 2002). Accordingly, we decline to follow the standard for the absence of justification as set forth in *Morgan* and conclude that we are bound to follow the analysis of our supreme court in *Winkler.*

In its motion for summary judgment and on appeal, Coke USA argues that it was "justified in its effort to protect its intellectual property rights and the superior quality associated with the Coca–Cola name." Coke USA's Br. p. 27. Coke USA appears to argue that any actions taken to protect its name, including threatening to prohibit its bottlers from bottling the beverage, are justified as a matter of law. Coke USA bases this argument on its trademark and its licensing agreements with its bottlers. However, whether Coke USA may enforce its licensing agreement with its bottlers is a different question from whether it acted in a fair and reasonable manner when it interfered with its bottlers' contract with Babyback's so as to force the bottlers to disassociate with Babyback's.

 Coke USA also contends that it acted in good faith in protecting its name. To the contrary, in its response to Coke USA's motion for summary judgment Ba-

byback's argued and designated evidence indicating that Coke USA did not want to continue its affiliation with Babyback's and that Coke USA misled Babyback's so that it would not take the co-marketing idea to competitors.

On appeal, Babyback's contends that there are genuine issues of fact as to whether Coke's actions were fair and reasonable. We agree with Babyback's. For example, Babyback's designated evidence in its motion in opposition to Coke USA's motion for summary judgment indicating that Coke USA continued its relationship with Babyback's to prevent Babyback's from taking the co-marketing idea to its competitors; that Coke USA was aware of Coke Indy's negotiations with Babyback's but made no objections until well after the written contract was executed; that after its own inspections of Babyback's facilities, Coke USA insisted that Babyback's upgrade its manufacturing facilities even though the USDA never cited Babyback's for any violations; and that Coke USA left out portions of its inspectors reports that were favorable to Babyback's in its requests that Babyback's upgrade its facilities.

The material facts of this case are highly disputed, and we cannot conclude, as a matter of law, that Coke USA's actions were fair and reasonable under the circumstances. Whether Coke USA's actions were justified is a question best left for a jury to decide. The trial court properly denied summary judgment on this issue.

### Conclusion

Because the fax from CCE to Babyback's satisfies the statute of frauds and there are genuine issues of material facts regarding Babyback's various tort claims against CCE and Coke USA, the trial court properly denied CCE's and Coke USA's motions for summary judgment. We affirm.

Affirmed.

KIRSCH, C.J., and DARDEN, J., concur.