

**FILED**

May 23 2018, 7:40 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEYS FOR APPELLANT | ATTORNEYS FOR APPELLEES |
|---|---|
| David M. Mattingly | David L. Swider |
| Michael A. Wukmer | Andrew M. McNeil |
| Mary Nold Larimore | Philip R. Zimmerly |
| Mark R. Alson | Bose McKinney & Evans, LLP |
| Robert A. Jorczak | Indianapolis, Indiana |
| Ice Miller, LLP | |
| Indianapolis, Indiana | |

# IN THE
# COURT OF APPEALS OF INDIANA

American Consulting, Inc. d/b/a American Structurepoint, Inc.,

*Appellant-Plaintiff/Cross-Appellee,*

v.

Hannum Wagle & Cline Engineering, Inc. d/b/a HWC Engineering, Inc., Marlin A. Knowles, Jr., Jonathan A. Day, Tom Mobley, and David Lancet,

*Appellees-Defendants/Cross-Appellants.*

May 23, 2018

Court of Appeals Case No. 49A02-1611-PL-2606

Appeal from the Marion Superior Court

The Honorable Heather A. Welch, Special Judge

Trial Court Cause No. 49D01-1503-PL-7463

**Robb, Judge.**

# Case Summary and Issues

[1] American Consulting, Inc., d/b/a American Structurepoint, Inc. ("ASI"), appeals the trial court's partial summary judgment in favor of Hannum Wagle & Cline Engineering, Inc., d/b/a HWC Engineering, Inc. ("HWC"), Marlin A. Knowles, Jr., Jonathan A. Day, Tom Mobley, and David Lancet (collectively, the "HWC Parties").[1]

[2] On appeal, ASI raises one issue, which we restate as whether the trial court erred in granting summary judgment to the HWC Parties on ASI's claims for liquidated damages resulting from alleged breaches in employment contracts by former ASI employees. On cross-appeal, the HWC Parties raise two issues, which we restate as: (1) whether the trial court should have granted summary judgment to the HWC Parties on ASI's claims regarding tortious interference with contractual relationships; and (2) whether the trial court should have granted summary judgment to the HWC Parties on ASI's claims regarding breach of employment contracts by former ASI employees.

[3] On ASI's appeal, we conclude the trial court erred in granting summary judgment to the HWC Parties on the issue of liquidated damages, and we reverse that part of the trial court's order. On the HWC Parties' cross-appeal, we conclude the trial court properly denied the HWC Parties' motion for

---

[1] We held an oral argument in this case on December 12, 2017, at the Indiana Court of Appeals courtroom in Indianapolis, Indiana. We commend the attorneys for their excellent preparation and advocacy.

summary judgment on ASI's claims of tortious interference with a contractual relationship and breach of contract, and we affirm as to those counts.

# Facts and Procedural History

[4] ASI is a civil engineering, architecture, planning, and design firm with offices in Indiana and several other states. HWC is also a civil engineering, architecture, planning, and design firm with offices in Indiana. ASI and HWC are competitors, and both provide services to public and private entities.

# I. Employment at ASI

[5] In 1994, Knowles began working for ASI as a construction inspector. Over the years, he was promoted, and by approximately 2004, his title was Vice President of Sales Administration. In 2008, Knowles acquired an ownership interest in ASI. On December 29, 2008, Knowles and ASI executed an Employment, Non-Disclosure and Non-Competition Agreement (the "Knowles Agreement"). Knowles agreed to several restrictive covenants as a condition of his employment with, and his equity interest in, ASI; specifically, the Knowles Agreement included both a non-compete provision and a non-recruitment clause. The non-compete provision precluded Knowles for two years following his termination of employment with ASI from selling, providing, attempting to sell or provide, or assisting any person in the sale or provision of competing products or services to ASI's customers with whom Knowles had contact on behalf of ASI in the two years preceding his termination. The non-compete provision further precluded Knowles from selling, providing, attempting to sell

or provide, or assisting any person in the sale or provision of competing products or services to any of ASI's active prospects. In addition, the non-recruitment clause precluded Knowles for the same two-year period from directly or indirectly soliciting, recruiting, hiring, or employing (or attempting to do the same) any ASI employee or otherwise inducing any ASI employee to terminate their employment at ASI.

[6] The Knowles Agreement further stipulated that any breach of a restrictive covenant would "give rise to irreparable injury to [ASI]." Corrected Appendix to Amended Appellant's Brief, Volume III at 205. Accordingly, the Knowles Agreement provided for specific remedies in the event of a breach. In part, in the event Knowles breached the non-compete provisions relating to the provision of services or solicitation of ASI clients, which resulted in the client terminating, withdrawing, or reducing its business with ASI, or purchasing any competing products or services from Knowles or a company with which Knowles was affiliated at the time of the breach, the Knowles Agreement mandated that Knowles "shall pay to [ASI] liquidated damages in an amount equal to forty five percent (45%) of all fees and other amounts that [ASI] billed to such customer during the [twelve]-month period immediately preceding such breach[.]" *Id.* Similarly, in the event Knowles violated the non-recruitment of ASI employees provision, "which results in an employee terminating his/her employment with [ASI]," the Knowles Agreement stipulated that he "shall pay to [ASI] liquidated damages in an amount equal to fifty percent (50%) of such terminating employee's total compensation from [ASI] for the twelve (12)

months immediately preceding such employee's termination of employment." *Id.*, Vol. III at 205-06.

[7]     In 1998, Lancet was hired at ASI, and in 2004, he was promoted to the position of field manager. As a result of his promotion, on April 1, 2004, Lancet executed an Employment Agreement with ASI, which contained non-recruitment and non-compete clauses. In 2007, Lancet was demoted to a resident project representative. At the time of the demotion, Lancet believed that his employment agreement would be deemed invalid. Nevertheless, on January 31, 2007, Lancet executed certain Terms and Conditions of Employment with ASI (the "Lancet Agreement"). This new agreement also included a non-recruitment clause, providing that for a period of two years following his termination of employment with ASI, Lancet would not solicit or offer employment to any ASI employee, or assist others to do the same. In the event that Lancet "engage[d] in conduct that violates these restrictions and causes an employee to terminate his/her employment with [ASI]," Lancet agreed to "pay to [ASI] liquidated damages in an amount equal to 100% of such employee's annual salary for the preceding calendar year." *Id.*, Vol. III at 196. Lancet did not recall signing the Lancet Agreement; he claimed that he did not read it prior to signing and did not receive a copy of it.

[8]     In 2003, Mobley was hired at ASI as an inspector. It does not appear that he was ever required to execute an employment agreement. In 2004, Day was hired at ASI as an inspector as well. He was eventually promoted to a resident project representative. On January 3, 2005, Day executed Terms and

Conditions of Employment (the "Day Agreement") with ASI. The Day Agreement, like the Knowles and Lancet Agreements, included a non-recruitment clause, providing that during his employment at ASI and for a period of two years thereafter, he would not solicit or offer employment to any ASI employee, or assist others to do the same. In the event that Day breached his covenant, thereby "caus[ing] an employee to terminate his/her employment with [ASI,]" Day agreed that he "shall pay to [ASI] liquidated damages in an amount equal to 100% of such employee's annual salary for the preceding calendar year." *Id.*, Vol. III at 121.

[9] At ASI, Knowles was responsible for generating business and developing the company's goodwill. His goal was to "[b]uild a relationship with a client. Identify a project. Help them figure out how to deliver that project or get funding for that project." *Id.*, Vol. VI at 76. Knowles was the "principal in charge" for public clients that included the Town of Cicero, Delaware County, the City of Fishers, Grant County, the City of Greendale, Hamilton County, Hancock County, the Indiana Department of Transportation ("INDOT"), LaGrange County, the City of Lawrenceburg, Morgan County, the City of Noblesville, Orange County, and Putnam County. *Id.*, Vol. V at 152.

## II. Move to HWC

### A. Knowles

[10] At the end of 2013, Knowles became dissatisfied with his employment at ASI and began searching for new opportunities. Knowles met with HWC's

President, Edward Jolliffe, and HWC's Executive Vice President, Terry Baker. Jolliffe and Baker were aware of Knowles' experience and "stellar" reputation in the industry. *Id.*, Vol. V at 218. They wanted to hire Knowles with the intent that he would eventually take over the company. During their initial meetings, Knowles discussed his ASI agreement with Jolliffe and Baker, and they intended to honor the Knowles Agreement "by putting him in operations rather than running sales—being in the sales cycle." *Id.*, Vol. V at 220. Jolliffe and Baker also desired for Knowles to overhaul HWC's transportation division, which was headed by Randy Hancock.

[11] On May 5, 2014, Knowles resigned from ASI. In his resignation letter, he informed ASI that he was "very aware of and will honor my existing employment contract as I have such respect for this great company and all the wonderful people here." *Id.*, Vol. III at 167. Knowles' last day of work at ASI was May 14, 2014. On May 19, 2014, HWC issued a press release announcing its hiring of Knowles as its Vice President of Operations. HWC forwarded the announcement to a list of "key clients" that Knowles formulated. *Id.*, Vol. VII at 99.

[12] At the time Knowles left ASI, he had a list of clients with whom he had worked; however, he did not share this list with Jolliffe, Baker, or other HWC colleagues—believing that to do so would have been a violation of the Knowles Agreement. Ultimately, he threw the client list away "[b]ecause I was not supposed to have material that was [ASI's]." *Id.*, Vol. VI at 74. Instead, he relied on his memory and own personal judgment for determining whether he

was prohibited from contacting clients based on their status as former, current, or prospective clients of ASI. Based on his discussions with Jolliffe and Baker, it was clear that Knowles understood that "[h]e was not to call on [ASI's] customers. And he was not to recruit their employees." *Id.*, Vol. III at 16. Knowles was responsible for "self-polic[ing]" his activity to ensure compliance with his restrictive covenants. *Id.*, Vol. VI at 75.

[13] Since joining HWC, it is undisputed that Knowles has been involved in contract negotiations and contract signings with at least the following ASI clients: City of Indianapolis, City of Muncie, Hamilton County, INDOT, Hancock County, City of Greenwood, City of Marion, City of Crawfordsville, Town of Cicero, City of New Albany, and City of Seymour. Although there is evidence indicating that Knowles was never directly involved in working with these clients in order to secure the projects for HWC, he did subsequently engage with the clients in order to finalize details and ensure the provision of the requested services. In addition, the undisputed evidence establishes that Knowles has maintained communication with a number of ASI clients since his departure for HWC. As a result of his position in the civil engineering industry, Knowles developed friendly relationships with many public officials who have responsibility for selecting engineering firms for public projects. Knowles has golfed, played poker, attended fishing trips, attended charity events, and met for meals and drinks with representatives of entities that ASI services. He has interacted with numerous officials at various industry events and conferences and has engaged in phone or texting conversations with some. According to

Knowles, spending time with clients—be it through breakfast meetings, playing golf, going fishing, etc.—is a necessary part of building a relationship that will prompt "them to want to do business with me." *Id.*, Vol. VI at 78. However, a plethora of individuals (*i.e.*, representatives of ASI clients) with whom Knowles had communicated submitted declarations, averring that none of their interactions with Knowles included any attempt on his part to solicit work on behalf of HWC.

## B. Other ASI Employees

[14]   Following Knowles' departure from ASI, a number of other ASI employees began exploring their options for new employment as well. Shortly after Knowles' departure from ASI, Clinton Sparks, an ASI employee, inquired with Knowles about employment with HWC. When Knowles indicated that he could not have such a discussion with Sparks, Sparks accessed HWC's website and found a list of approximately fifteen to twenty job openings. Accordingly, Sparks submitted his resume through HWC's website. Hancock, as the director of the transportation division for HWC, reports to Knowles and is responsible for hiring all staff in the transportation group. When Hancock received Sparks' resume, he forwarded it to Knowles and Jolliffe and indicated that it was the "[f]irst of perhaps many?" *Id.*, Vol. VII at 105. Hancock asked Knowles about Sparks' qualifications, and Knowles also reported to Jolliffe that Sparks is "a good engineer" who "knows how to make money in our business." *Id.*, Vol. VI at 92. Jolliffe subsequently interviewed Sparks and extended an offer of

employment. Instead of informing ASI that he was transferring to HWC, Sparks announced his departure as a retirement.

[15] On August 11, 2014, Sparks began his job at HWC. Thereafter, he engaged in conversations with Hancock regarding "potential engineers." *Id.*, Vol. VI at 177. Sparks reached out to Lancet at ASI and asked if Lancet "knew of anybody that was unhappy or had any potential candidates." *Id.*, Vol. VI at 59. In response, Lancet suggested Amber Tolle, an ASI construction inspector and road designer. Sparks advised Lancet to delete their correspondence "because if the sharks [at ASI] smell the blood who knows." *Id.*, Vol. VI at 45. The following month, Sparks met Tolle for lunch and discussed her prospects at HWC. Tolle "had grown unhappy with ASI during the last several years of [her] employment" and "did not feel like [she] was being used to [her] full potential." *Id.*, Vol. IV at 3. Because Sparks seemed so happy at HWC, Tolle applied. When Hancock received Tolle's resume, he consulted with Knowles about her potential employment. In October of 2014, Hancock interviewed Tolle and advised her that HWC might have a position for her in early 2015. Around that time, Sparks misdirected an email with Tolle's application information to Knowles' former ASI email address, which was still being monitored by ASI, thereby alerting ASI to possible poaching efforts by HWC and Knowles. On March 3, 2015, Tolle received an offer from HWC.

[16] Also within a few weeks of Knowles moving to HWC, Day advised Knowles that he, too, was "ready to leave [ASI] and that he was going to submit a [resume] to HWC." *Id.*, Vol. VI at 94. Upon receipt of Day's resume, Hancock

conferred with Knowles regarding Day's qualifications; Knowles offered a favorable recommendation. Knowles also informed Jolliffe that Day "was a good guy. He did a good job at [ASI]." *Id.*, Vol. VI at 97. Jolliffe subsequently interviewed Day, and during the interview, Day advised Jolliffe that Lancet was also interested in leaving ASI for a career at HWC. On August 8, 2014, HWC sent an offer letter to Day. On August 11, 2014, Day submitted his resignation to ASI. During his exit interview, ASI did not remind Day that he had executed the Day Agreement, and Day testified that he was unaware that he was bound by any restrictive covenants. The next day, he accepted HWC's offer of employment.

[17] Within a month of beginning his job at HWC, Day compiled a spreadsheet of potential recruits for HWC. Nine of the ten potential recruits on the list were ASI employees, including, in part: Lancet, Chris Holth, Mobley, Tim Conarroe, and Melissa Walker. Day forwarded his list of potential recruits to Knowles. Although Knowles instructed Day to send the list to Hancock, Knowles conceded that he had regular meetings with Hancock and Day as part of "identifying candidates to fill the needs that [HWC] would have in [its] inspection group." *Id.*, Vol. VI at 10. Hancock relied on Day's list of potential employees "as a point of reference when I was trying to fill needs on our inspection staff." *Id.*, Vol. VI at 162. Furthermore, Knowles also maintained two working lists of potential recruits, which included ASI employees. Knowles forwarded these lists to Hancock, Day, and HWC's human resources director.

[18]  Day contacted numerous ASI employees to gauge their interest in an HWC employment opportunity and subsequently forwarded the applications of his former ASI colleagues to HWC management. As text messages reveal, Day kept Knowles apprised of his efforts in recruiting ASI (and other) employees, and Knowles commended Day for his leadership and success in filling their team. In one conversation regarding the issuance of offer letters, Knowles and Day laughed about hearing a rumor that ASI executives had to hold an "impromptu war room meeting" over staff retention concerns. *Id.*, Vol. VII at 14.

[19]  On August 22, 2014, Day advised Knowles that Holth had submitted a resume to HWC, and a few days later, Day notified Knowles that "[n]o one has reached out to Holth yet." *Id.*, Vol. VI at 232. Knowles instructed Day to remind Hancock "to touch base with [Holth]." *Id.*, Vol. VI at 232. In March of 2015, HWC sent an offer letter to Holth; however, it appears that Holth elected to remain at ASI.

[20]  In the fall of 2014, Walker, an ASI construction inspector and utility coordinator, was working on a project with Mobley, at which time Mobley encouraged her to speak with Day. After nearly eight years with ASI, Walker had "grown unhappy"—believing that she had been "pigeon-holed in an administrative assistant role" despite her engineering degree. *Id.*, Vol. IV at 10. Day advised her that she could submit a resume to HWC. On December 8, 2014, Walker emailed a copy of her resume to Day for him to forward to the appropriate individual at HWC. The following month, Hancock invited

Walker for an interview and offered her a job with HWC. She accepted on March 9, 2015, and resigned from ASI on March 13, 2015.

[21] Day, who had also been communicating with Mobley since his departure from ASI, informed Knowles on September 24, 2014, that Mobley "want[ed] out" at ASI. *Id.*, Vol. VI at 235. At the end of 2014, Mobley submitted a resume to Day, which Day forwarded to Hancock. On February 11, 2015, HWC offered a job to Mobley, and Mobley accepted on February 21, 2015. At the time of his acceptance, Mobley did not have a definite start date with HWC, so he continued to work at ASI. During that time, Mobley engaged in discussions with other ASI employees about his own opportunity at HWC and encouraged others to submit their resumes.

[22] Once Knowles left ASI, Lancet knew that it was time to "[p]olish [his] [resume] and hang on." *Id.*, Vol. VI at 141. While Lancet was still at ASI, he conversed with other employees regarding their dissatisfaction with their ASI employment, and he forwarded a list of names to Day. Lancet eventually applied to HWC, and he met with Jolliffe in early 2015. On February 11, 2015, Lancet received an offer of employment from HWC, which he accepted on February 18, 2015.

[23] In November of 2014, ASI employee Clinton Graham was at Day's house when Day informed him that HWC "was probably going to be hiring in the spring of 2015." *Id.*, Vol. III at 233. The next month, Graham, a construction inspector, emailed his resume to Hancock via HWC's website. According to

Graham, he wanted better wages than ASI paid, he felt neglected by ASI, and ASI was "losing its family feel." *Id.*, Vol. III at 234. Hancock offered a position to Graham in January of 2015, which Graham accepted on March 2, 2015. However, at the time Graham accepted the job, no position was technically available at HWC, so he did not immediately resign from ASI.

[24] In February of 2015, while still working at ASI, Mobley contacted one of his ASI colleagues, Conarroe, to see whether Conarroe would have any interest in applying to HWC. Mobley indicated that at least four other ASI employees were ready to jump ship to HWC. The next day, Conarroe alerted his supervisor at ASI to the fact that Mobley was attempting to recruit ASI employees for HWC. This, in addition to the suspicions that were raised when Tolle's HWC application was misdirected to an ASI email address, prompted an investigation by ASI. On March 3, 2015, ASI executives and attorneys interviewed Mobley and Lancet regarding their reported recruitment activities. During his interview, Mobley stated that Day had requested a list of potential ASI employees, and although he did not provide such a list to Day, he did talk to several employees and advised them that they could contact Day directly about job opportunities. Mobley identified Lancet as the ringleader in recruiting activities. Mobley also informed ASI executives that Lancet, Walker, Holth, Graham, and Tolle had all been offered positions with HWC. Lancet admitted during his interview that he had provided a list of potential employees to Day and had also had conversations with other ASI employees regarding their general interest in joining HWC.

ASI executives and attorneys also summoned Tolle, who had not yet started at HWC, to a "very hostile" meeting, during which they "interrogat[ed]" her as to who had recruited her to HWC. *Id.*, Vol. III at 107. Tolle denied that anyone had persuaded her to join HWC; rather, she stated that her decision to leave was based "primarily on the unhappiness I had experienced at ASI for a few years." *Id.*, Vol. IV at 5. Similarly, on March 4, 2015, Walker, also still working at ASI, was subjected to an "investigation meeting." *Id.*, Vol. III at 12. Walker indicated that she "chose to work for HWC because it was right for my career. I did not come to HWC just because people I knew had come to HWC." *Id.*, Vol. IV at 12. Also in March of 2015, ASI executives interviewed Graham, who confirmed that he had discussed his move to HWC with both Day and Mobley; however, Graham stated that Day "did not cause me to leave ASI. My motivation in joining HWC was purely financial." *Id.*, Vol. III at 234. On March 6, 2015, ASI terminated Mobley's and Lancet's employment.

## III. The Present Case

On March 6, 2015, ASI filed a complaint against the HWC Parties, alleging breach of contract by Knowles, Day, and Lancet; breach of the duty of loyalty by Lancet and Mobley; unfair competition against all defendants; civil conspiracy against all defendants; tortious interference with ASI's contractual relationships; tortious interference with ASI's business relationships; and unjust enrichment against all defendants. ASI sought a preliminary injunction in addition to damages.

On September 29 and 30 and October 1, 2015, the trial court held a hearing on ASI's motion for a preliminary injunction. On December 11, 2015, the trial court granted ASI's request for an injunction as to Knowles, Lancet, and Day. The trial court denied ASI's request for a preliminary injunction against Mobley.[2]

On March 8, 2016, the HWC Parties filed a Motion for Summary Judgment, a brief in support of their motion, and a designation of evidence in support of the motion pursuant to Indiana Trial Rule 56. The HWC Parties claimed that "there are no genuine issues of material fact with respect to ASI's claims" and requested summary judgment on all claims brought by ASI. *Id.*, Vol. VII at 86. The HWC Parties later filed a designation of supplemental evidence to support their motion for summary judgment. On June 9, 2016, ASI filed a response in opposition to the HWC Parties' summary judgment motion, along with its designation of evidence. On June 23, 2016, the HWC Parties filed a reply brief in support of their summary judgment motion, along with additional designated evidence.

On July 7, 2016, the trial court held a hearing on the motion. During the hearing, ASI agreed to dismiss its claim regarding unjust enrichment as against

---

[2] The HWC Parties appealed the trial court's issuance of the preliminary injunction, and on November 30, 2016, our court affirmed the trial court. *See Hannum Wagle & Cline Eng'g, Inc., d/b/a HWC Eng'g, Inc. et al. v. American Consulting, Inc., d/b/a American Structurepoint, Inc.*, 64 N.E.3d 863, 882 (Ind. Ct. App. 2016). On May 20, 2016, the trial court dissolved the preliminary injunction as to Knowles because the two-year restricted time period had expired. Our court also affirmed this order in the same decision. *See id.* at 884. On August 23, 2016, the trial court dissolved the preliminary injunction as to Day.

all defendants. On September 13, 2016, the trial court issued its Order, denying in part and granting in part the HWC Parties' motion for summary judgment. The trial court determined that there were genuine issues of material fact as to whether Knowles, Day, and Lancet had breached their employment contracts and caused damages to ASI. However, the trial court granted summary judgment for the HWC Parties as to the issue of liquidated damages from any breach, finding that the remedies clauses contained in each of the Knowles, Day, and Lancet Agreements were unenforceable as a matter of law. The trial court denied the HWC Parties' motion for summary judgment on ASI's claim that Lancet breached his duty of loyalty but granted summary judgment as to Mobley. The trial court granted summary judgment to the HWC Parties on ASI's claim for unfair competition. The trial court denied the HWC Parties' claim for summary judgment on ASI's claim of civil conspiracy with respect to HWC, Knowles, Day, and Lancet, but granted summary judgment on this count as to Mobley. For ASI's claim that HWC had tortiously interfered with contractual relationships, the trial court denied the HWC Parties' motion for summary judgment as to Knowles but granted summary judgment as to Day, Lancet, and Mobley. The trial court also granted the HWC Parties' motion for summary judgment on ASI's claim for tortious interference with business relationships. Finally, the trial court granted the HWC Parties' motion for summary judgment on ASI's claim of unjust enrichment.

[30] The HWC Parties filed a Motion to Reconsider, which the trial court denied on October 3, 2016. On October 13, 2016, ASI filed a motion to certify the trial

court's Order for interlocutory appeal, along with a motion for stay pending appeal. The trial court certified the Order for interlocutory appeal but declined to stay the proceedings. Following the trial court's summary judgment ruling, the following counts remain: breach of contract by Knowles, Day, and Lancet; breach of duty of loyalty by Lancet; civil conspiracy as to HWC, Knowles, Day, and Lancet; and tortious interference by HWC in ASI's contractual relationship with Knowles. A jury trial on the remaining counts is set to begin in May of 2018.

[31] On January 3, 2017, our court accepted jurisdiction over the interlocutory appeal. ASI has raised one issue on appeal, and the HWC Parties have raised two issues on cross-appeal. Additional facts will be provided as necessary.

# Discussion and Decision

## I. Standard of Review

[32] Summary judgment is appropriate in cases where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). On appeal, we review summary judgment rulings *de novo*. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). Our court "stands in the shoes of the trial court, applying the same standards in deciding whether to affirm or reverse summary judgment." *Weinreb v. Fannie Mae*, 993 N.E.2d 223, 231 (Ind. Ct. App. 2013), *trans. denied*. Thus, in reviewing a summary judgment ruling, "we must determine whether there is a genuine issue of material fact and whether the trial court has correctly applied the law." *Id.* "A fact is 'material' if

its resolution would affect the outcome of the case, and an issue is 'genuine' if a trier of fact is required to resolve the parties' differing accounts of the truth, or if the undisputed material facts support conflicting reasonable inferences." *Hughley*, 15 N.E.3d at 1003 (quoting *Williams v. Tharp*, 914 N.E.2d 756, 761 (Ind. 2009)).

[33] The party moving for summary judgment bears the initial burden of demonstrating the absence of any genuine issue of fact as to a determinative issue. *Id.* Thereafter, the burden shifts "to the non-movant to 'come forward with contrary evidence' showing an issue for the trier of fact." *Id.* (quoting *Williams*, 914 N.E.2d at 761-62). We must consider all of the designated evidence in a light most favorable to the non-moving party. *Weinreb*, 993 N.E.2d at 231. "Although the non-moving party has the burden on appeal of persuading us that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that he was not improperly denied his day in court." *Hughley*, 15 N.E.3d at 1003 (quoting *McSwane v. Bloomington Hosp. & Healthcare Sys.,* 916 N.E.2d 906, 909-10 (Ind. 2009)). A grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Haegert v. McMullan*, 953 N.E.2d 1223, 1230 (Ind. Ct. App. 2011).

[34] Furthermore, although not required, the trial court in this case issued findings of fact and conclusions of law in support of its judgment. These special findings are not binding on appeal. *Weinreb*, 993 N.E.2d at 231. However, they "offer

this court valuable insight into the trial court's rationale" and serve to "facilitate appellate review." *Id.*[3]

## II. ASI's Appeal: Liquidated Damages

[35] ASI claims the trial court erred by granting the HWC Parties' motion for summary judgment with respect to the various liquidated damages provisions in the Knowles, Day, and Lancet Agreements. "The term 'liquidated damages' applies to a specific sum of money that has been expressly stipulated by the parties to a contract as the amount of damages to be recovered by one party for a breach of the agreement by the other, whether it exceeds or falls short of actual damages." *Time Warner Entm't Co., v. Whiteman*, 802 N.E.2d 886, 893 (Ind. 2004). "A typical liquidated damages provision provides for the forfeiture of a stated sum of money upon breach without proof of damages." *Id.*

[36] The Knowles Agreement included the following liquidated damages provisions for breach of the non-compete or non-recruitment clauses:

> [11.b.] In the event [Knowles] breaches [the non-compete clauses] of this Agreement and the customer to which such breach pertains terminates, withdraws or reduces its business with [ASI] or purchases any Competing Products/Services from [Knowles] or any entity with which [Knowles] is then employed or otherwise affiliated as a result of such breach (each such incident a "Company Customer Loss Breach") then, with respect to each Company Customer Loss Breach, [Knowles] shall pay to

---

[3] We commend the trial court for meticulously organizing the issues and thoroughly discussing the reasons for its decision in a detailed sixty-five-page Order, which, indeed, facilitated our review of this case.

[ASI] liquidated damages in an amount equal to forty five percent (45%) of all fees and other amounts that [ASI] billed to such customer during the 12-month period immediately preceding such breach. . . . [ASI] and [Knowles] agree (i) that the damages resulting from a Company Customer Loss Breach would be difficult to quantify with precise measurement, (ii) that the foregoing liquidated damages are a reasonable estimate of the damages [ASI] would incur as a result of a Company Customer Loss Breach and (iii) that such liquidated damages do not, and are not intended to, constitute a penalty. . . .

[11.c.] In the event [Knowles] hires or employes, or assists any person or entity in the hiring or employment of, any employee of [ASI] in violation of the restrictions set forth in [the non-recruitment clause] of this Agreement, or otherwise engages in any conduct that violates [the non-recruitment section] which results in an employee terminating his/her employment with [ASI] (each such incident an "Employee Loss Breach"), then, with respect to each such Employee Loss Breach, [Knowles] shall pay to the Company liquidated damages in an amount equal to fifty percent (50%) of such terminating employee's total compensation from [ASI] for the twelve (12) months immediately preceding such employee's termination of employment (or, if such terminating employee was employed by [ASI] for less than all of the preceding twelve (12) months, an amount equal to fifty percent (50%) of such employee's salary or compensation rate, calculated on an annualized basis, at the time of the termination of such employee's employment with [ASI]). . . . [ASI] and [Knowles] agree (i) that the damages resulting from an Employee Loss Breach would be difficult to quantify with precise measurement, (ii) that the foregoing liquidated damages are a reasonable estimate of the damages [ASI] would incur as a result of an Employee Loss Breach and (iii) that such liquidated damges do not, and are not intended to, constitute a penalty.

Corrected App. to Amended Appellant's Br., Vol. III at 205-06. The Lancet and Day Agreements each included the following liquidated damages provision:

> [ASI] spends considerable time and effort selecting and training its employees, one of [ASI's] most valuable assets. [ASI] and its customers would suffer considerable harm if its employees were to leave [ASI]. Accordingly, [ASI] must take steps to protect its investment in employees. In consideration of your employment with [ASI], you agree that while you are employed by [ASI] and for a period of two (2) years thereafter (the "Covenant Period"), you shall not, solicit or endeavor to entice away, provide information to others purposely with the intent of helping them solicit or entice away, knowingly offer employment to, knowingly employ, or offer or conclude any contract for services with, any person who is employed by [ASI] at the date your employment with [ASI] ceases. You acknowledge that if you engage in conduct that violates these restrictions and causes an employee to terminate his/her employment with [ASI], then immediately upon demand of [ASI], you shall pay to [ASI] liquidated damages in an amount equal to 100% of such employee's annual salary for the preceding calendar year (or, if such employee was not employed by [ASI] during the preceding calendar year, or was employed by [ASI] for less than all of the preceding calendar year, an amount equal to 100% of such employee's salary, on an annualized basis, at the time of the termination of such employee's employment with [ASI]). You further agree that the foregoing liquidated damages are a reasonable estimate of the damages that [ASI] would incur as a result of such violations, and that such liquidated damages do not constitute a penalty . . . .

*Id.*, Vol. III at 121 (Day Agreement), 196 (Lancet Agreement).

[37] ASI has asserted that the HWC Parties solicited at least twenty-three ASI clients in violation of the non-recruitment clause of the Knowles Agreement and that seven employees terminated their employment at ASI as a result of recruitment efforts in violation of the Knowles, Lancet, and Day Agreements. ASI proffered that, with respect to the improper recruitment of its employees, the Knowles Agreement calls for liquidated damages of $272,165.46; the Day Agreement demands liquidated damages of $238,373.68; and the Lancet Agreement warrants liquidated damages of $176,812.65. Regarding the alleged violations of the non-compete provisions in the Knowles Agreement, ASI did not provide an estimate of liquidated damages; however, the trial court found that "ASI's revenue streams suggest the liquidated damages could be in the range of millions of dollars." *Id.*, Vol. II at 50.

[38] Generally, liquidated damages clauses are enforceable "where the nature of the agreement is such that damages for breach would be uncertain, difficult, or impossible to ascertain." *Weinreb*, 993 N.E.2d at 232. Although "[w]e are tolerant of provisions within contracts which provide for liquidated damages[,]" it is well established that "contractual provisions constituting penalties" are not enforceable. *Id.*; *Coffman v. Olson & Co.*, 906 N.E.2d 201, 209 (Ind. Ct. App. 2009), *trans. denied*. Whether a contract provision providing for liquidated damages is an unenforceable penalty is a question of law for the court to decide. *Art Country Squire, L.L.C. v. Inland Mortgage Corp.*, 745 N.E.2d 885, 891 (Ind. Ct. App. 2001). The primary distinction between an unenforceable penalty provision and an enforceable liquidated damages provision "is that a penalty is

imposed to secure performance of the contract and liquidated damages are to be paid in lieu of performance." *Weinreb*, 993 N.E.2d at 233.

[39] "In determining whether a contract provision constitutes liquidated damages or an unenforceable penalty, we consider the facts, the intention of the parties, and the reasonableness of the stipulation under the circumstances of the case." *Art Country Squire, L.L.C.*, 745 N.E.2d at 891. The parties' use of words such as "'damages,' 'penalty,' 'forfeiture,' and 'liquidated damages' are not conclusive, but should be considered in connection with other provisions in the contract to determine the nature of the provisions." *Weinreb*, 993 N.E.2d at 233. "Thus, even though the question is one of law, it may require resolution of underlying factual issues." *Art Country Squire, L.L.C.*, 745 N.E.2d at 891. Where such is the case, summary judgment is inappropriate. *Indiana Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 27 N.E.3d 260, 264 (Ind. 2015). "[D]espite the plethora of abstract tests and criteria for the determination of whether a provision is one for a penalty or liquidated damages, there are no hard and fast guidelines to follow." *Dean V. Kruse Found., Inc. v. Gates*, 973 N.E.2d 583, 592 (Ind. Ct. App. 2012), *trans. denied*.

[40] In this case, the trial court determined that the liquidated damages clauses in each of the employment contracts are unenforceable as a matter of law because they constitute penalties. Specifically, the trial court found:

> I. Count I – Breach of Contract Claims Against Knowles, Lancet, and Day
> * * *

b. Marlin A. Knowles:

* * *

2. Liquidated damages

* * *

This Court does find . . . as a matter of law that the liquidated damages provisions in the Knowles Agreement are punitive and thus unenforceable. The purpose behind liquidated damages is to allow parties to come together and agree on a set monetary damages amount that would be likely to make the aggrieved party mostly whole. This figure may not adequately account for injuries suffered by the aggrieved party; or it could exceed them if the aggrieved party is able to quickly move on following such a breach of contract. In either case, the damages are seen as part of the bargained for arrangement through the contract negotiations and should not be sued to create unreasonable penalties that would constitute an unforeseen consequence of breach.

The liquidated damages provision in the Knowles [Agreement] provides no such certainty. The clause allows damages to balloon out of control in the event of multiple employee exits, as has been the case here, regardless of the level of Knowles' involvement or the amount of actual damages suffered by ASI. While the Court recognizes that this allows the clause to scale up damages to be commiserate [sic] with the number of employees involved, the valuation of the damages far exceeds what ASI could have reasonably expected to suffer. . . .

c. Jonathon Day

* * *

2. Liquidated Damages

The liquidated damages provision in the Day Agreement would hold Day liable for 100% of the salary of each employee that left ASI as a result of Day's alleged actions. As this Court found with Knowles' Agreement, the liquidated damages provision in the Day Agreement is unenforceable as a matter of law. This provision would subject Day to a damages figure of $238,373.68.

This figure is not reasonably related to any actual damages incurred as a result of Day's alleged breach based on the evidence provided to this court. . . . As in the Knowles [A]greement, this Court finds the liquidated damages provision in the Day Agreement to be grossly disproportionate to damages designated by ASI and instead serves only to be a penalty to Day to threaten compliance. . . .

d. [David] Lancet
* * *
2. Liquidated Damages
The liquidated damages provision in the Lancet Agreement was the same as the provision in the Day Agreement. For reasons discussed earlier, the Court similarly finds Lancet's liquidated damages provision to be unenforceable as a matter of law.

Corrected App. to Amended Appellant's Br., Vol. II at 41, 50-55, 57-58.[4]

[41] In general, "damages recoverable in a breach of contract case . . . are limited to actual damages suffered." *Merrillville Conservancy Dist. ex rel. Bd. of Dirs. v. Atlas Excavating, Inc.*, 764 N.E.2d 718, 724 (Ind. Ct. App. 2002). Thus, the purpose

---

[4] The trial court also found that the liquidated damages provision in each Agreement was akin to a "shotgun clause." Corrected App. to Amended Appellant's Br., Vol. II at 52-53, 57. In *Seach v. Richards, Dieterle & Co.*, 439 N.E.2d 208 (Ind. Ct. App. 1982), we discussed that liquidated damages provisions that are triggered by "acts of different degrees of importance or of no importance" but "nevertheless precipitate the same result" constitute "shotgun clauses" that should be treated as penalties. *Id.* at 215-16 (citation omitted). In *Seach*, the clause at issue was triggered by a violation or breach of any provision of the non-compete clause, which prohibited contacting, advising, visiting, or in any way soliciting the employer's clients. The liquidated damages calculation for any violation was three times the employer's gross annual billing to any such client. The court held the clause was a penalty. *Id.* at 216. In *Seach*, the *act* triggered the damages clause. Here, only a given *result* from the act triggers the clause. *See*, *e.g.*, Corrected App. to Amended Appellant's Br., Vol. III at 205 (Knowles Agreement, specifcying that liquidated damages provision applies if Knowles violates the non-compete clause *and* the client terminates, withdraws, or reduces its business with ASI as a result). Accordingly, we reject the trial court's characterization of these clauses as shotgun clauses.

of liquidated damages is to compensate for a breach where damages "would be uncertain and difficult to ascertain[,]" which is why liquidated damages provisions typically "provide[] for the forfeiture of a stated sum of money without proof of damages." *Harbours Condo. Ass'n v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006). We recognize that there is a contradiction between this purpose and the requirement that there be proportionality to the actual loss. *Id.* As a result, our court has determined that although "a party who seeks to enforce a liquidated damages clause need not prove actual damages," it "may be required to show a correlation between the liquidated damages and actual damages in order to assure that a sum charged may fairly be attributed to the breach." *Id.* "Generally, we look more favorably upon a liquidated damages provision where it appears from all the evidence that a good faith effort was made by both parties to determine a reasonable amount of liquidated damages and that the actual amount was uncertain or difficult to ascertain at the time of the execution of the agreement." *Art Country Squire, L.L.C.*, 745 N.E.2d at 891. The party seeking to enforce the liquidated damages provision bears the burden of demonstrating "*some* proportionality between the loss and the sum established as liquidated damages." *Weinreb*, 993 N.E.2d at 234 (emphasis added).

[42] It is well established that "where the liquidated damages are 'grossly disproportionate to the loss which may result from the breach or [are] unconscionably in excess of the loss sought to be asserted, [we] will treat the sum as a[n] [unenforceable] penalty rather than as liquidated damages." *Art*

*Country Squire, L.L.C.*, 745 N.E.2d at 891 (alterations in original).  However, in

*Time Warner Entm't Co., L.P. v. Whiteman*, 802 N.E.2d 886 (Ind. 2004), our

supreme court expressed

> some unease over any decision where what appears to be the
> freely bargained agreements of the parties are set aside.  Fixing
> the respective rights and expectation of the parties as to damages
> makes economic and commercial sense.  Enforcing such
> provisions would seem to conform to this Court's longstanding
> recognition of the freedom of parties to enter into contracts and
> our presumption that contracts represent the freely bargained
> agreement of the parties.

*Id.* at 894-95.

[43]    For several reasons, we conclude the trial court erred in finding the liquidated

damages provisions in the Agreements were an unenforceable penalty.  First,

these were individually negotiated agreements.  We interpret a contract based

on the terms of the instrument considered in light of all the facts and

circumstances.  *Prall v. Indiana Nat. Bank*, 627 N.E.2d 1374, 1377 (Ind. Ct. App.

1994).  We begin analyzing contract provisions with the presumption that a

contract is the freely bargained agreement of the parties.  *Dexter Axle Co. v. Baan*

*USA, Inc.*, 833 N.E.2d 43, 49 (Ind. Ct. App. 2005).  We recognize a very strong

presumption that freely negotiated contracts are enforceable, based on the

policy that it is in the best interest of the public for courts not to unnecessarily

restrict the freedom to contract.  *Zollman v. Geneva Leasing Assocs., Inc.*, 780

N.E.2d 387, 391-92 (Ind. Ct. App. 2002). When we review a contract, the intent

of the parties is determined from the four corners of the instrument if the

language is unambiguous. *Id.* at 392. Here, Knowles, Day, and Lancet all agreed via their employment contracts with ASI that in the event they breached their contractual obligations, the injury arising from such breach would be difficult to precisely quantify and the liquidated damages provision was a reasonable estimate of damages ASI would incur. They each acknowledged that the liquidated damages provision was not intended to be a penalty, but to compensate ASI for losses incurred by their breach. The language in each Agreement is unambiguous, and clearly indicates an intent by the parties that the amount listed in the Agreements would represent a proportional estimate of the damages that would be incurred by ASI if an employee violated the restrictive covenants contained therein.

[44] Second, besides the general similarities in the language of the the Agreements, they each had different provisions reflecting the differing relationships between ASI and its various employees. The Terms and Conditions of Day's and Lancet's employment included only a restriction against recruiting ASI employees and a provision setting the liquidated damages for a breach at 100% of the previous year's salary for any employee who leaves employment with ASI due to Day's or Lancet's efforts at recruitment. Corrected App. to Amended Appellant's Br., Vol. III at 121, 196. Lancet's agreement was changed when his position with the company changed so that he went from having non-recruitment *and* non-compete restrictions to just a non-recruitment restriction. In apparent recognition of Knowles higher position in the company and his different responsibilities, the terms of his contract were broader –

encompassing contact with both ASI employees *and* clients after his separation from employment with ASI. The amount determined to be appropriate liquidated damages for Knowles' violation of the non-compete as to ASI's clients was 45% of that client's business with ASI in the previous calendar year, and for hiring or employing any ASI employee was 50% of the departing employee's annual salary. *Id.*, Vol. III at 205-06. Thus, the liquidated damages provisions were not just boilerplate language inserted mechanically into every ASI contract but appear to be a fair consideration of the rights and responsibilities of each employee, the information with which each was entrusted, and the damage that could be done to ASI from a particular employee's breach.

[45] With respect to Knowles' more expansive contract and therefore more extensive exposure to liability, the backdrop against which the contract was signed is important. Knowles was a twenty-year employee of ASI. He had risen through the ranks at the company and was ultimately an equity partner and a member of the board of directors. In acknowledgment that he was privy to ASI's trade secrets and confidential information, and to protect ASI's business relationships and goodwill, *see id.*, vol. III at 199, Knowles signed the employment agreement which included the non-compete, non-recruitment, and liquidated damages provisions when he became an equity partner. When Knowles left his employment with ASI, ASI bought out his equity in the company at a cost of approximately $150,000. There is no indication Knowles was unaware of the terms of this agreement or that there was a great disparity in

bargaining power between Knowles and ASI such that he signed the contract unwillingly. *See Nylen v. Park Doral Apartments*, 535 N.E.2d 178, 184 (Ind. Ct. App. 1989). In fact, there is evidence Knowles was very much aware of the non-compete and liquidated damages provisions of his contract, as he specifically acknowledged them in his resignation letter to ASI. *See* Corrected App. to Amended Appellant's Br., Vol. III at 167. Knowles was a sophisticated party signing an agreement which gave him an equity interest in the company in exchange for his promise to protect the company and its assets. Day and Lancet may not have had bargaining power as great as Knowles when it came to signing an agreement with their employer, but significantly, their agreements were only two pages long, and there is no indication that they were not aware of or did not understand the restrictions and the damages provision, or that they were forced upon them under duress. *Cf. Weaver v. American Oil Co.*, 257 Ind. 458, 464, 276 N.E.2d 144, 148 (1971) (noting a contract provision should not be enforced if one party can show that the other party had a "prodigious amount" of bargaining power it used to its advantage and the contract provision in question was unknown or unexplained to the lesser party).

[46] Third, the actual damages caused by the recruitment of any one ASI employee, let alone multiple employees as happened here, are difficult to ascertain because the nature of the business ASI is in is highly dependent on cultivating and maintaining client relationships. *See, e.g., Id.*, Vol. VI at 76-78 (Knowles acknowledging that the way to secure business is to build relationships and therefore goodwill with clients). During the hearing, ASI indicated that it

incurred expenses in recruiting and training new employees, and that its employees who joined HWC had billed a total revenue of $1,047,045 for ASI in their last year of employment. The fact that ASI is unable to quantify the costs of recruiting and training new employees to replace those lost to HWC, or to estimate how much revenue was lost in the two years after they left does not mean there are no such costs. When a company has recruited and trained an employee, it has incurred up-front costs it hopes to recover in the future as its investment in the employee begins to pay off with increased skill and enhanced client relationships. That employee leaving gives the benefits of the company's training and the relationships the employee cultivated while in the company's employ to a competitor, and even if the new employee brings in revenue, it is impossible to know if a more experienced employee with existing client relationships could have brought in more. Even though a certain amount of employee turnover is to be expected, this does not appear to be normal course-of-business employee turnover. ASI identified seven valuable employees lost not just to the competitive market, but to HWC specifically. The very fact that ASI is unable to quantify its costs in losing existing employees and recruiting and training new employees shows why a liquidated damages provision is appropriate.

[47] Similarly, the nature of the process of bidding for and being awarded civil engineering contracts shows why damages are difficult to quantify on this front. The evidence establishes that it is standard in this industry for one client to use multiple civil engineering firms, even on the same project. ASI may have lost a

contract altogether due to HWC's interaction with an ASI client or, due to HWC's interference, it may have lost a percentage of a contract it was awarded. It is impossible to know how the contracts would have been awarded had HWC not had numerous contacts with ASI's clients in violation of the non-compete agreement. By their very nature, liquidated damages clauses estimate in advance a specific sum of money to be recovered which may ultimately exceed or fall short of actual damages. *Time Warner*, 802 N.E.2d at 893. That in hindsight the amount may be too high or too low does not necessarily make the provision a penalty for either party.

[48] Finally, we note that the trial court focused almost exclusively on the dollar amount the HWC Parties could be liable for based on ASI's allegations and the formula laid out in the liquidated damages provisions. ASI identified seven employees and at least eleven clients recruited and/or solicited by the HWC Parties over the course of approximately one year. That is a substantial number of potential breaches of the restrictive covenants. However, there is a causation element to each liquidated damages provision. The recruitment of an ASI employee must have resulted in the employee actually terminating his or her employment with ASI in order for liquidated damages to be collected. Knowles' solicitation of an ASI client must have resulted in the client actually terminating, withdrawing, or reducing its business with ASI in order to invoke the liquidated damages provision. Our supreme court has stated that "the Court will almost always uphold [a liquidated damages clause for violation of a covenant not to compete] unless the amount is *grossly* disproportionate to the

loss and *far beyond any possible damages* that could be incurred." *Raymundo v. Hammond Clinic Ass'n*, 449 N.E.2d 276, 284 (Ind. 1983) (emphasis added). Because liquidated damages do not have to be (and indeed, cannot be) exact, but only roughly proportional to the damage anticipated to be incurred, consideration of factors beyond the dollar amount is important to the evaluation of whether a liquidated damages provisions amounts to a penalty. Whether or not the HWC Parties conduct caused ASI employees to leave ASI and/or ASI clients to terminate or reduce their business with ASI is a question of fact, the resolution of which will ultimately determine whether the liquidated damages set in the employment contracts are roughly proportionate to the actual damage ASI incurred by their loss as employees or clients. ASI must prove that causation at trial in order to be entitled to liquidated damages, but we cannot categorically say on summary judgment that ASI is not entitled to *any* liquidated damages.

[49]     In sum, liquidated damages in this case serve exactly the purpose for which they were designed because:

- These were negotiated agreements, in which the parties agreed in clear and explicit terms that liquidated damages were appropriate.

- The relative bargaining power of the parties was reflected in the agreements, in that the agreements had different provisions and different damages calculations depending on the employee's tenure and position.

- The actual damages are difficult to calculate because of the widespread and ongoing nature of the contacts between the HWC Parties and ASI employees and clients.

- The actual damages are difficult to calculate because ASI was required to seek and train *multiple* new people due to the HWC Parties' targeted recruitment efforts.

- The actual damages are difficult to calculate because the nature of the business means ASI could have lost only some or all of any one client's business due to HWC's interference.

Accordingly, we hold the trial court erred in declaring the liquidated damages provisions are unenforceable as a matter of law, and we reverse the trial court's grant of summary judgment to the HWC Parties on this issue.

# III. HWC's Cross-Appeal

## A. Tortious Interference with Contractual Relationship

[50] The HWC Parties challenge the trial court's denial of their motion for summary judgment on the issue of tortious interference with a contractual relationship. This claim by ASI "refers to HWC's alleged strategy to offer positions to ASI employees in order [to] weaken ASI" despite the existence of the non-recruitment clauses in the employment contracts. Corrected App. to Amended Appellant's Br., Vol. II at 59. The trial court denied summary judgment as to the Knowles Agreement but granted it as to the Lancet and Day Agreements and as to Mobley.

[51] It is long recognized in Indiana "that intentional interference with a contract is an actionable tort, and includes an intentional, unjustified interference by third parties with an employment contract." *Duty v. Boys & Girls Club of Porter Cty.*, 23

N.E.3d 768, 774 (Ind. Ct. App. 2014). This tort is reflective of the public policy "that contract rights are property and, under proper circumstances, are entitled to enforcement and protection from those who tortiously interfere with those rights." *Id.* Proof of tortious interference with a contractual relationship requires satisfaction of the following elements: "(1) that a valid and enforceable contract exists; (2) the defendant's knowledge of the existence of the contract; (3) defendant's intentional inducement of breach of the contract; (4) the absence of justification; and (5) damages resulting from defendant's wrongful inducement of the breach." *Id.*

[52] On cross-appeal, the HWC Parties contend that they are entitled to summary judgment with respect to the Knowles Agreement[5] because the undisputed facts negate an essential element of ASI's tortious interference claim—namely, that HWC was justified in recruiting ASI's employees notwithstanding whether it would breach any of the employment agreements at issue. A plaintiff must do more than merely assert that the defendant's conduct was unjustified in order to establish tortious interference with a contract. *Morgan Asset Holding Corp. v. CoBank, ACB*, 736 N.E.2d 1268, 1272 (Ind. Ct. App. 2000). Rather, in determining whether a defendant's conduct was justified, our supreme court has previously consulted the Restatement, which

---

[5] Although the HWC Parties also argue that the trial court should have granted summary judgment for them with respect to the Lancet Agreement, it appears from the trial court's Order that it did so.

recommends the consideration of the following factors: "(a) the nature of the defendant's conduct; (b) the defendant's motive; (c) the interests of the plaintiff with which the defendant's conduct interferes; (d) the interests sought to be advanced by the defendant; (e) the social interests in protecting the freedom of action of the defendant and the contractual interests of the plaintiff; (f) the proximity or remoteness of the defendant's conduct to the interference; and (g) the relations between the parties."

*Winkler v. V.G. Reed & Sons, Inc*, 638 N.E.2d 1228, 1235 (Ind. 1994) (quoting Restatement (Second) of Torts § 767 (1977)). "[T]he weight to be given to each consideration may differ from case to case depending upon the factual circumstances." *Winkler*, 638 N.E.2d at 1235.

[53] In its Order, the trial court stated:

> While the Court recognizes that HWC may have made the offers of employment for legitimate business reasons, it gives pause to allow the evidence designated to grant summary judgment. HWC has argued that it was motivated solely by business interests when it was recruiting ASI employees. With the evidence present, the Court cannot find such as a matter of law. There is clearly a genuine issue of fact created by the volume of evidence showing that HWC officers were specifically targeting ASI employees. Knowles and Day both identified several targets at ASI to work at HWC and shared their thoughts with Jolliffe, Baker, and Hancock. They held frequent discussions about status on securing people to move. The nature of the communications exchanged between Knowles, Jolliffe, Baker, Day, and Lancet, further create a genuine issue of material fact as to whether HWC was motivated by the opportunity to severely harm ASI as a result of HWC's expansion.

Corrected App. to Amended Appellant's Br., Vol. II at 66.

[54] We have indicated in numerous cases that the absence of justification is established by demonstrating "that the interferer acted intentionally, without a legitimate business purpose, and the breach is malicious and exclusively directed to the injury and damage of another." *Haegert*, 953 N.E.2d at 1234-35. We have found that "the existence of a legitimate reason for the defendant's actions provides the necessary justification to avoid liability." *Morgan Asset Holding Corp.*, 736 N.E.2d at 1272. Yet, our court has also criticized the "malicious standard" and has instead considered the absence of justification based on "whether the defendant's conduct was fair and reasonable under the circumstances," which requires analyzing the Restatement factors. *Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 51 (Ind. Ct. App. 2004), *vacated on other grounds by* 841 N.E.2d 557 (Ind. 2006) (summarily affirming our court's decision on the tortious interference claim). In reconciling the seemingly different standards adopted by our courts for evaluating the absence of justification element, we find that the Restatement factors have been consistently applied in tortious interference cases. These factors—specifically, the nature of the defendant's conduct, the defendant's motive, and the interests sought to be advanced by the defendants—would necessarily include an analysis of any evidence that the defendant acted maliciously and without a legitimate business purpose, as well as whether the defendant acted fairly and reasonably under the circumstances. *See Haegert*, 953 N.E.2d at 1230; *Coca-Cola Co.*, 806 N.E.2d at 51.

[55] We agree with the trial court and ASI that there are genuine issues of material fact that preclude the HWC Parties' request for summary judgment on this count. There is evidence that HWC may have had a legitimate business purpose that would have justified recruiting ASI's employees despite the non-recruitment clauses in the various employment contracts. Testimony indicated that HWC sought to expand its transportation department and had open positions that it needed to fill with skilled employees. For employees who had grown unhappy at ASI, HWC represented better pay and more opportunity for growth. However, there is also evidence that HWC may have specifically targeted its competitor's employees for improper reasons. Knowles and Day maintained lists of ASI employees as potential recruits, and there was ongoing encouragement of efforts to recruit ASI employees. The evidence establishes that the HWC Parties acknowledged the impact of their actions on ASI and called for discretion in their recruiting efforts to prevent "the sharks [at ASI from] smell[ing] the blood." Corrected App. to Amended Appellant's Br., Vol. VI at 45. The HWC Parties—particularly Knowles and Day—were amused by ASI's struggle to retain staff and having to hold an "impromptu war room meeting." *Id.*, Vol. VII at 14. Thus, given the numerous factors to consider, this task is best left to a trier of fact. We conclude that the trial court properly denied the HWC Parties' motion for summary judgment on ASI's claim of tortious interference with a contractual relationship by HWC.

# B. Breach of Contract

[56] Finally, the HWC Parties claim that the trial court should have granted its motion for summary judgment with respect to ASI's breach of contract claims based on the Knowles, Day, and Lancet Agreements. To prevail on a breach of contract claim, the plaintiff must prove "the existence of a contract, the defendant's breach thereof, and damages." *Gatto v. St. Richard Sch., Inc.*, 774 N.E.2d 914, 920 (Ind. Ct. App. 2002). Here, the HWC Parties contend that they have successfully negated the element of damages such that ASI cannot prevail on this claim as a matter of law.

[57] Damages for breach of contract are "limited by what is reasonably foreseeable at the time the parties entered into the contract." *Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010). Additionally, "[i]t is axiomatic that a party injured by a breach of contract may recover the benefit of its bargain but is limited in its recovery to the loss actually suffered." *L.H. Controls, Inc. v. Custom Conveyor, Inc.*, 974 N.E.2d 1031, 1043 (Ind. Ct. App. 2012). "[A]n award of damages for lost profits cannot be based upon mere conjecture or speculation." *Id.* Rather, an award of damages must be based on "some fairly defined standard, such as cost of repair, market value, established experience, rental value, loss of use, loss of profits, or direct inference from known circumstances. The damages claimed also must be the natural, foreseeable, and proximate consequence of the breach." *Id.* (internal citation omitted). "Merely alleging that [p]laintiffs have not produced evidence of damages is insufficient to" warrant summary judgment. *Morris v. Crain*, 71

N.E.3d 871, 880 (Ind. Ct. App. 2017). As movants, the HWC Parties were required to make a *prima facie* showing that ASI has not suffered damages before the burden shifted to ASI to come forward with evidence of damages. *Id.*

[58] In this case, the HWC Parties contend the record is devoid of any evidence that ASI suffered actual harm. They argue that ASI hired replacement employees and "still made the money it would have made off of billing the work of the employees who departed. Consequently, ASI didn't lose a cent from HWC's successful recruitment of these employees." Appellees' Brief at 37. The HWC Parties also assert that there was not "a single instance" established where any ASI client withdrew, terminated, or reduced its business with ASI because of Knowles' improper solicitation. *Id.* at 39.

[59] Regarding the loss of seven employees, ASI did not quantify the damages it purportedly suffered to replace them and train the new recruits; ASI did contend, however, that it somehow lost the $1,047,045 in revenue that the valuable departing employees had billed in the prior year. In addition, as found by the trial court, ASI presented evidence that since Knowles joined HWC,

> ASI's gross revenue from Hamilton County has been declining. In 2013, the first full year before Knowles left, ASI achieved gross bookings with Hamilton County of approximately $258,000. Since Knowles has left ASI, the numbers have steadily, and drastically, decreased: approximately $194,000 in 2014, $126,000 in 2015, and $0 to date in 2016. . . . Further, of the approximately $126,000 in ASI's booked contracts in 2015 with Hamilton County, none were for construction inspection

projects, and just $19,528 stemmed from bridge design projects, representing a more-than-75% decrease as compared to 2014.

Corrected App. to Amended Appellant's Br., Vol. II at 31. ASI further alleged that it has suffered other "intangible damages" as a result of HWC causing a disruption in ASI's operations, in addition to lost goodwill, administrative expenses, and "an erosion of its pipeline of . . . key clients." Appellant's Combined Response and Reply Br. at 43-44.

[60]    The trial court noted

> that generating business for civil engineering firms is more complicated than simply hanging out a shingle and selling services to interested parties. Projects are rarely awarded to one firm, and multiple firms may work in different roles on a single development. While merit and effective bidding play a role in winning contracts for these firms, relationships with clients play a crucial role as well by cultivating a trust in a firm's efficacy.

Corrected App. to Amended Appellant's Br., Vol. II at 46. Thus, the trial court determined that

> [w]hile ASI could have provided more information regarding actual damages, ASI has sufficiently created a genuine issue of material fact by asserting it has been damaged through the unexpected departure of employees as well as a decrease in revenue from certain clients with whom Knowles was involved at ASI. ASI has raised sufficient evidence to at least allow this determination to come before a trier of fact.

*Id.*, Vol. II at 49. We agree.

Indiana's summary judgment standard "consciously errs on the side of letting marginal cases proceed to trial on the merits, rather than risk short-circuiting meritorious claims." *Hughley*, 15 N.E.3d at 1004. Here, although there is minimal evidence of ASI's actual losses, and there is discrepancy in whether ASI accurately portrayed its Hamilton County business, ASI has raised issues that must be resolved by a fact-finder. *See id.* Therefore, we conclude that the trial court properly denied summary judgment to the HWC Parties on the breach of contract claims because they did not negate the element of damages.

## Conclusion

Based on the foregoing, we conclude that the HWC Parties were not entitled to summary judgment on the matter of liquidated damages, and we reverse and remand that issue to the trial court for further proceedings. And because there are genuine issues of material fact as to ASI's claims of tortious interference and breach of contract, the HWC Parties are not entitled to summary judgment on those issues, either.

Affirmed in part and reversed in part.

Pyle, J., concurs.

Riley, J., concurs in part and dissents in part.

# IN THE
# COURT OF APPEALS OF INDIANA

American Consulting, Inc.
d/b/a American Structurepoint,
Inc.,

*Appellant-Plaintiff,*

v.

Hannum Wagle & Cline
Engineering, Inc. d/b/a HWC
Engineering, Inc., Marlin A.
Knowles, Jr., Jonathan A. Day,
Tom Mobley, and David Lancet,

*Appellees-Defendants.*

Court of Appeals Case No.
49A02-1611-PL-2606

**Riley, Judge, concurring in part and dissenting in part.**

I agree with the majority's decision that the HWC Parties are not entitled to summary judgment with respect to ASI's claims of tortious interference and breach of contract. Therefore, I concur with respect to these issues. However, I respectfully dissent from the majority's determination that the trial court erroneously granted summary judgment to the HWC Parties on ASI's claims for liquidated damages.

[65]  In this case, the trial court determined that the liquidated damages clauses in each of the employment contracts are unenforceable as a matter of law, in part, because the liquidated damages sought by ASI are disproportionate and not reasonably related to expected actual damages. Thus, the trial court concluded that the liquidated damages provisions in each of the three employment agreements at issue should be considered a penalty designed to force compliance with the contracts. I agree.

[66]  It is well established that "where the liquidated damages are 'grossly disproportionate to the loss which may result from the breach or [are] unconscionably in excess of the loss sought to be asserted, [we] will treat the sum as a[n] [unenforceable] penalty rather than as liquidated damages.'" *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 891 (Ind. Ct. App. 2001) (alterations in original). The party seeking to enforce the liquidated damages provision bears the burden of demonstrating "some proportionality between the loss and the sum established as liquidated damages." *Weinreb v. Fannie Mae*, 993 N.E.2d 223, 234 (Ind. Ct. App. 2013), *trans. denied*. Furthermore, our court has determined that while "a party who seeks to enforce a liquidated damages clause need not prove actual damages," it "may be required to show a correlation between the liquidated damages and actual damages in order to assure that a sum charged may fairly be attributed to the breach." *Harbours Condo. Ass'n v. Hudson*, 852 N.E.2d 985, 993 (Ind. Ct. App. 2006).

[67]  I find that ASI has failed to meet its burden of establishing a correlation between the amount of liquidated damages it seeks and any actual loss. Liquidated damages must be designed to compensate for the actual damages likely to result from a breach, not to create a burden that necessarily compels compliance with a contract. *See Gershin v. Demming*, 685 N.E.2d 1125, 1128 (Ind. Ct. App. 1997). Regarding the employees who were allegedly recruited in violation of employment agreements, ASI argues that it lost seven valuable employees but did not otherwise specify how it had financially suffered. During the hearing, ASI indicated that it incurred expenses in recruiting and training new employees, but it did not quantify these costs. ASI also pointed out that its employees who joined HWC had billed a total revenue of $1,047,045 for ASI in their last year of employment, but ASI gave no indication that it was unable to find replacement employees with the same qualifications and billing capacity or that it expected to lose any revenue as a result of the HWC Parties' recruitment efforts. Essentially, ASI's evidence of loss amounts to the cost of employee turnover that may be expected in any competitive market. While I do not disagree that hiring seven new employees with the same skill set and earning potential would result in certain costs, any loss that may have resulted due to a breach of the employment contracts is clearly grossly disproportionate to the $687,351.79 sought in liquidated damages.

[68]  Moreover, any argument that the liquidated damages provisions are reasonable is diminished by the fact that ASI has identified the same employee's recruitment as a violation of multiple employment agreements. To illustrate,

ASI has indicated that it is entitled to liquidated damages of 150% of Lancet's salary because he was purportedly recruited in violation of both the Knowles and Day Agreements. Similarly, Mobley, Clinton Graham, Melissa Walker, and Amber Tolle were allegedly recruited in violation of the Knowles, Day, *and* Lancet Agreements; thus, ASI essentially seeks 250% of their respective salaries in liquidated damages from the HWC Parties. Again, this is grossly disproportionate to any anticipated actual loss. Moreover, to hold any of the above individuals accountable for paying such substantial sums of money in the event he breached his employment contract is a clear attempt to compel performance of the contract, which constitutes a penalty.

[69] As for Knowles' purported violations of his non-compete restrictions involving the solicitation of ASI clients, I again find no correlation between 45% of the solicited client's previously billed fees and ASI's "pre-estimate[d] loss" for a breach. *Merrillville Conservancy Dist. ex rel. Bd. of Dirs. v. Atlas Excavating, Inc.*, 764 N.E.2d 718, 725 (Ind. Ct. App. 2002). Considering the specific facts of this case, especially the nature of the bidding process for civil engineering contracts, the award of a contract to HWC did not simultaneously equate to a loss of work for ASI. The evidence establishes that it is standard in the industry for one client to utilize multiple civil engineering firms, even on the same project. Both HWC and ASI provide services for public and private clients that award multi-million-dollar contracts, such as, for example, INDOT. The HWC Parties note evidence that ASI's relevant "trailing [twelve]-month revenue with INDOT [totaled] approximately $5,000,000." (Appellees' Br. p. 18). The

HWC Parties also point out that HWC was awarded two contracts from INDOT in the year following Knowles' departure from ASI, for both of which ASI was not eligible because of its other INDOT contracts. One of the INDOT contracts awarded to HWC was for $198,350 while the other had a cap of $1,000,000. Yet, based on the language of the liquidated damages provision, Knowles would be responsible for paying $4,500,000 (45% of $5,000,000 for each breach) to ASI for this client alone. This is more than double the amount of the contracts that HWC was awarded and in spite of evidence that ASI was not eligible to receive these contracts. Thus, the liquidated damages provision fails to set forth a reasonable estimate of ASI's actual anticipated loss and is penal in nature.

[70] Accordingly, the liquidated damages clauses at issue are clearly intended to operate as punishment for a breach of the employment contracts rather than as a reasonable estimation of ASI's actual damages. Therefore, I would hold that the liquidated damages clauses in each of the agreements at issue are unenforceable as a matter of law.[6] The trial court properly granted summary judgment to the HWC Parties on this issue, and I would affirm in all respects.

---

[6] However, this holding would not extinguish ASI's claim for actual damages in the event that a breach of contract is established. *See Hahn v. Drees, Perugini & Co.*, 581 N.E.2d 457, 463 (Ind. Ct. App. 1991).